UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

---

IN THE MATTER OF THE SEARCH OF:

A black Samsung Portable Electronic
Device with telephone number (605)
441-1492

CASE NUMBER: ___5:19-mj-31___

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR
SEARCH WARRANT**

---

STATE OF SOUTH DAKOTA)
                                     ) SS
COUNTY OF PENNINGTON   )

I, Brad C. Merrill, Special Agent with the United States Fish and Wildlife
Service, being first duly sworn upon oath, depose and state as follows:

1.      Your Affiant is a Special Agent with the Department of the Interior,
U.S. Fish and Wildlife Service (USFWS), Office of Law Enforcement, stationed in
Hot Springs, South Dakota.   Your Affiant has served as a Federal law
enforcement officer for twenty-three years.   Your Affiant has conducted and
assisted in criminal investigations that involved the service of Federal Search
Warrants at businesses and private residences.   These Search Warrants have
included the seizure of portable electronic devices and computers.   Your Affiant
has been trained in the investigation of wildlife criminal violations and the
identification of wildlife.   Through training and experience, your Affiant is
familiar with Federal laws found in Titles 16 and 18 of the United States Code
(U.S.C.).

2.     This Affidavit is submitted in support of a Search Warrant for a portable electronic device with telephone number (605) 441-1492.  This device is known to be a black Samsung cell phone used and/or owned by Lavern Curry.

3.     Your Affiant sets forth that a cell phone is a type of portable electronic device used for voice communication through radio signals.  These phones send signals through networks of transmitter/receivers called "cells," enabling communication with other cell phones or traditional "land line" phones.  A cell phone usually includes a "call log," which records the phone number, date, and time of calls made to and from the phone.

4.     In addition to enabling voice communications, cell phones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Cell phones may also include global positioning system ("GPS") technology for determining the location of the device.

5.     The facts and information contained in this Affidavit are based upon your Affiants personal knowledge, investigation, and observations made by other law enforcement officers assisting with this investigation.  Additional

2

information was obtained from confidential sources cooperating with the investigation. All observations referenced below that were not personally made by your Affiant were related to your Affiant by the persons who made such observations. This Affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by your Affiant or known to the Government. However, no information, known to your Affiant, that would tend to negate probable cause, has been withheld from this Affidavit.

6.      This investigation focuses on the unlawful take and offer for sale of wildlife that originated in and around Oglala Lakota County South Dakota, including on Tribal lands of the Oglala Sioux Tribe. Specifically, the wildlife is trophy caliber big game animals to include elk and deer.

7.      Your Affiant sets forth as relevant information that, in general, big game hunting in South Dakota is managed by the South Dakota Department of Game, Fish and Parks (SDGFP) on all public and private deeded lands within the State. The season dates, bag limits and management units are determined by the SDGFP. SDGFP big game licenses are valid only in the management unit specified on the license. These licenses are not valid on Tribal lands within the State of South Dakota.

8.      Your Affiant further sets forth that Native American Tribes in South Dakota manage all hunting, including big game hunting, on Tribal lands. The season dates, bag limits and management units are determined by

3

the respective Native American Tribe.  Tribal hunting licenses are not valid on private deeded lands, even when those lands are located inside the exterior boundaries of an Indian Reservation

9.      The Lacey Act, 16 U.S.C. §§ 3372(a)(1) et seq., makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law.

10.     The Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) et seq., makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any state.

11.     The Lacey Act, 16 U.S.C. §§ 3372(a)(4) et seq., makes it unlawful for any person to attempt to commit any act as described in paragraphs (1)-(4) of the Statute.  Your Affiant notes that paragraphs (1) and (2) of the Statute are documented above.

12.     South Dakota Statute § 41-14-1 makes it unlawful for any person to possess or control any big game animal, or any part of a big game animal, that has been unlawfully taken, caught, or killed in any other state or foreign country, or that has been unlawfully transported into South Dakota.

4

13.     The Oglala Sioux Tribe Fish, Wildlife and Recreation Code Chapter 36, Section §7.09 states that no person shall have in his/her possession or under his/her control at any time any fish, wildlife or carcass and/or part thereof, knowing that the same has been taken unlawfully or during a closed season for such species.

14.     The Oglala Sioux Tribe Fish, Wildlife and Recreation Code Chapter 36, Section §7.11 states that except as otherwise provided in this chapter, no person shall lend, share, give, transfer, sell, barter or trade to any person any identification document, license, permit, tag, or other type of approval issued by the Tribe pursuant to this chapter.

15.     Beginning in November 2016, your Affiant received information from Oglala Sioux Parks and Recreation Authority (OSPRA) Law Enforcement Ranger Stanley Clifford concerning Lavern Curry's suspected involvement with unlawful big game hunting on Tribal land within the exterior boundaries of the Pine Ridge Indian Reservation. It was known to Ranger Clifford, and other OSPRA Law Enforcement Rangers, that Lavern Curry was an enrolled member of the Oglala Sioux Tribe, with a suspected history of taking trophy caliber big game animals without the proper license(s).

16.     On November 9, 2016, your Affiant reviewed a photograph that depicted Lavern Curry posing with a harvested 6x7 trophy bull elk. The photograph was posted on the internet on both Lavern Curry's personal Facebook page and on the Facebook page titled, "South Dakota Hunting." A

5

subsequent check confirmed that Lavern Curry did not possess either a State of South Dakota or Oglala Sioux Tribe elk hunting license that would have authorized his 2016 harvest of the animal.

17.     Your Affiant later learned from Ranger Clifford that intelligence information received from confidential source(s) indicated that Lavern Curry killed the 6x7 bull elk sometime during October 2016. Further, it was suspected the elk was killed in the area of Yellow Bear Canyon in Oglala Lakota County, South Dakota. The confidential sources provided information that they saw Lavern Curry in possession of the large antlers from the bull elk around a residence Lavern Curry was known to live at and/or frequent at the time.

18.     Throughout November 2016, OSPRA Law Enforcement Rangers attempted to contact Lavern Curry in reference to the suspected unlawful harvest of the 6x7 bull elk. The Officers reported that Lavern Curry would not answer the door to his home when they knocked and further ignored attempts to contact him by telephone. Following the attempted contacts with Lavern Curry, OSPRA Law Enforcement Rangers received intelligence information that led them to believe that Lavern Curry took steps to hide and/or move portions of the harvested elk, specifically the large 6x7 antlers.

19.     In October 2018, Your Affiant, along with OSPRA Law Enforcement Ranger Morgan Tibbets, received information that Lavern Curry again harvested a trophy caliber 6x6 bull elk on or around the Pine Ridge

Indian Reservation.. Your Affiant reviewed photographs posted on both Lavern Curry's personal Facebook page and the Facebook paged titled, "Rez Bucks, Bulls & Predators-RBBP" that showed Lavern Curry and a person, thought to be a relative of Curry's, posing with a 6x6 bull elk. Captions and/or comments associated with the photographs indicated Lavern Curry killed the trophy animal in the Yellow Bear Canyon area of Oglala Lakota County, South Dakota. The captions/comments further documented that Lavern Curry stated the elk was killed in a "free roaming," "fair chase," Tribal hunt and that Lavern Curry had received an elk license via the "Lottery" for the animal. A subsequent check confirmed that Lavern Curry, despite his Facebook comments, did not possess either a State of South Dakota or Oglala Sioux Tribe elk hunting license that would have authorized his 2018 harvest of the animal.

20.     Throughout October 2018, Ranger Tibbets conducted investigation of Lavern Curry's suspected involvement with the unlawful harvest of the 6x6 bull elk. Ranger Tibbets received a photograph from a confidential source that showed Lavern Curry posing with the 6x6 bull elk antlers removed from the elk carcass. Ranger Tibbets, and other OSPRA Law Enforcement Rangers, were unable to recognize the location at which the photograph was taken.

21.     During the investigation, Ranger Tibbets learned of general comments reportedly made by Lavern Curry about the inability of the OPSRA Law Enforcement Rangers to catch him committing wildlife violations.

Specifically, Ranger Tibbets understood the comments to be connected to the unlawful harvest of trophy elk and deer by Lavern Curry from 2016 to the present. In response, Ranger Tibbets continued the investigation and learned that Lavern Curry's primary hunting vehicle was a 2002 Chevrolet K2500HD pickup, bearing South Dakota License plate #WY053. Ranger Tibbets conducted physical surveillance of Lavern Curry at various times throughout October 2018 and up to November 1, 2018. Ranger Tibbets was unable to ascertain the location of the suspected unlawfully taken bull elk, or parts thereof, from either the 2016 or 2018 hunt(s). Furthermore, due to the challenges in conducting a physical surveillance in remote areas without detection, Ranger Tibbets was unable to determine, with a degree of accuracy, the hunting locations utilized by Lavern Curry, and more specifically the types of hunting areas that produce trophy quality big game animals. Ranger Tibbets was able to confirm, however, that the 2002 Chevrolet K2500HD pickup was operational, and that Lavern Curry was utilizing the vehicle for purposes that appeared to be related to hunting/scouting activity.

22.    On November 7, 2018, your Affiant applied for and received a Federal Search Warrant that authorized the installation, maintenance, and ultimate removal of a mobile tracking device on Lavern Curry's 2002 Chevrolet K2500HD pickup. This Search Warrant was sought in an effort to gather evidence of the violations above, to include patterned elk hunting locations of Lavern Curry and the whereabouts of both the 2016 and 2018 trophy bull elk,

8

or parts thereof, believed to be maintained by Lavern Curry. It was believed that the vehicle location information would further provide timely information on the patterns and habits of Lavern Curry in regards to his suspected propensity to take trophy deer, during the month of November, on and around Tribal lands of the Oglala Sioux Tribe.

23. On November 9, 2018, Ranger Tibbets conducted surveillance on Lavern Curry's 2002 Chevrolet K2500HD pickup in final preparation for your Affiant to install the mobile tracking device on the vehicle. Ranger Tibbets observed, however, that the vehicle now appeared to be broken down and not functional. Based on the above information provided by Ranger Tibbets, your Affiant did not execute the Federal Search Warrant authorizing the installation of the mobile tracking device and returned the document to the U.S. Clerk of Courts Office, Rapid City, South Dakota.

24. On November 10, 2018, Ranger Clifford came into contact with a confidential source who was lawfully hunting in Oglala Lakota County, South Dakota. Ranger Clifford determined the confidential source possessed information about Lavern Curry's harvest of the 2018 trophy bull elk. Throughout the contact, it became clear to Ranger Clifford that the confidential source was not aware that Lavern Curry's harvest of the 2018 elk was suspected to be unlawful. Additionally, the confidential source confirmed that Ranger Tibbet's recent observations of Lavern Curry's 2002 Chevrolet K2500HD pickup being broken down were accurate. The confidential source

9

stated the transmission in the pickup had gone out. The confidential source agreed to provide additional information to Ranger Clifford about Lavern Curry's suspected wildlife violations if and when such information became known.

25.     On November 12, 2018, Ranger Clifford received information from the confidential source concerning Lavern Curry. The confidential source confirmed Lavern Curry's cell phone telephone number to be (605) 441-1492 and further provided a photograph to Ranger Clifford that showed Lavern Curry posing with the harvested 2018 trophy bull elk. The confidential source confirmed the photograph was obtained directly from Lavern Curry via a text message.

26.     On November 14, 2018, your Affiant reviewed the photograph that was provided to Ranger Clifford by the confidential source. Your Affiant recognized Lavern Curry and further recognized distinct features of the trophy bull elk's antlers to confirm the elk in the photograph was the same elk suspected to have been unlawfully killed during the 2018 season. Your Affiant used an Exif tool application to look at the metadata linked to the digital photograph and noted the GPS coordinates of N43 23 26.00, W102 01 01.00 were embedded in the image data. Your Affiant entered the above coordinates into a computerized mapping program and saw the location to be on the northeast facing slope of a heavily wooded draw. The draw was located on Tribal lands of the Oglala Sioux Tribe, in rural Jackson County, South Dakota.

10

This particular location is a short distance, northeast, of the Yellow Bear Canyon area.  Based on training and experience, your Affiant suspected the GPS coordinates to be the kill site of the 2018 trophy bull elk.

27.     On November 14, 2018, your Affiant relayed the GPS coordinate information to Ranger Tibbets.   Upon receipt of the information, Rangers Tibbets and Clifford traveled to the specified GPS coordinates, searched the immediate area and located the suspected kill site of the 2018 trophy bull elk. Rangers Tibbets and Clifford documented the area and collected items of evidence, including two (2) spent .25-06 caliber shell casings, from the scene.

28.     On November 16, 2018, Ranger Clifford received information from the confidential source concerning Lavern Curry.  The confidential source reported exchanging text messages with Lavern Curry and receiving a photograph of a juvenile male, believed to be Lavern Curry's son, holding the antlers from the 2018 trophy bull elk.  The confidential source further reported that Lavern Curry, on behalf of a relative, was now attempting to sell the elk antlers for $3,000.00.

29.     From approximately November 16-28, 2018, at the request of Ranger Clifford, the confidential source maintained communications with Lavern Curry through telephone calls, text messages and Facebook messages. The purpose of these communications was to arrange a time in which the confidential source would go big game hunting with Lavern Curry.  Ultimately,

11

the confidential source and Lavern Curry were unable to arrange a hunting trip and the hunt did not occur.

30.      On November 28-30, 2018, at the request of Ranger Clifford, the confidential source relayed information to Lavern Curry that the confidential source knew a person who was interested in purchasing the antlers from the 2018 trophy bull elk.  The confidential source told Lavern Curry the person who was interested in purchasing the antlers needed to know how the antlers "scored" before committing to the purchase.

31.      Your Affiant sets forth that it is a common practice to have trophy caliber antlers, from all species of big game animals, measured by known standards published by the Boone and Crocket trophy hunting club. These measurements are how a trophy set of antlers are "scored."  In general terms, a set of high scoring antlers demand a higher commercial value than antlers with a lower score.

32.      On November 28-30, 2018, at the request of Ranger Clifford, the confidential source continued communicating with Lavern Curry via telephone calls, text messages, and Facebook messages.    As a result of these communications, Lavern Curry agreed to transport the 2018 trophy elk antlers to Rapid City, South Dakota in an effort to meet the proposed buyer and sell the antlers for $2,500.00.  Lavern Curry agreed to meet the prospective antler buyer in the parking lot of the Comfort Suites hotel, near exit 61 off Interstate 90.

33.     On November 30, 2018, your Affiant conducted surveillance of the Comfort Suites parking lot. Your Affiant saw a black Dodge pickup, driven by Lavern Curry, arrive at the location. Your Affiant notes the large 6x6 elk antlers were clearly visible in the open bed of the pickup. Your Affiant further saw the pickup had two (2) additional passengers.

34.     On November 30, 2018, as Lavern Curry waited in the parking lot for the prospective antler buyer, your Affiant and South Dakota Department of Game, Fish and Parks Conservation Officer Chris Dekker activated their vehicle red/blue emergency lights and made contact with Lavern Curry and the other occupants of the pickup. The additional occupants of the vehicle were identified as Chastity Shot with Arrow and Jonathan Doyle.

35.     On November 30, 2018, Your Affiant interviewed Lavern Curry about the suspected unlawful harvest of the 6x6 trophy bull elk. Lavern Curry explained that Chastity Shot with Arrow was the person who possessed a valid 2018 Oglala Sioux Tribe elk hunting permit. Lavern Curry denied he killed the elk and stated that Chastity Shot with Arrow was the person who hunted, killed and properly tagged the animal. Lavern Curry additionally denied that he transported the elk antlers to Rapid City, South Dakota for the purpose of selling the antlers.

36.     On November 30, 2018, Ranger Clifford interviewed Jonathan Doyle about the suspected unlawful harvest of the 6x6 trophy bull elk. Jonathan Doyle initially stated that Chastity Shot with Arrow hunted and

wounded the elk.  Jonathan Doyle later admitted, however, that Chastity Shot with Arrow was not present on the elk hunt and that both he and Lavern Curry shot at and ultimately killed the bull elk.  Jonathan Doyle stated that Lavern Curry was the first person to shoot at the bull elk.  Your Affiant notes that neither Lavern Curry nor Jonathan Doyle possessed a 2018 elk hunting license that authorized their take of the elk.  Your Affiant further submits that it is unlawful, as documented in paragraph 14 above, for any person to transfer an Oglala Sioux Tribe hunting license/permit to another individual.

37.    On November 30, 2018, Ranger Tibbets interviewed Chastity Shot with Arrow who admitted she did not shoot at or kill the 2018 trophy bull elk.  Chastity Shot with Arrow explained she was pregnant and was at her home at the time the elk was killed.  Chastity Shot with Arrow further admitted she knew her license was later used to fraudulently tag the animal.

38.    On November 30, 2018, based on information from the interviews with Lavern Curry, Jonathan Doyle and Chastity Shot with Arrow, combined with the additional investigation information as summarized in this document, your Affiant seized the 6x6 bull elk antlers and Lavern Curry's Samsung cell phone as evidence. Your Affiant notes that Lavern Curry voluntarily handed his cell phone to your Affiant upon request.  Your Affiant further notes that Lavern Curry's cell phone was not searched, rather the device was sealed in an evidence bag and placed in secure storage at the

14

USFWS Office of Law Enforcement in Hot Springs, South Dakota, so as your Affiant could make this application.

39.     On December 6, 2018, your Affiant and Ranger Tibbets met with the confidential source whose communications with Lavern Curry documented Curry's agreement to transport, and potentially sell, the 2018 trophy elk antlers.   Your Affiant documented all the text and Facebooks messages between the confidential source and Lavern Curry.   Your Affiant reviewed each of these messages and noted that Lavern Curry stated he knew a few people that were in the business of buying deer and elk antlers.   Your Affiant further saw that Lavern Curry sent a photograph of the 2016 6x7 trophy bull elk to the confidential source.   Lavern Curry referenced the 2016 6x7 bull elk and stated that he sold the antlers for $2,000.00.   The identity of the person who purchased the 2016 bull elk antlers is unknown to your Affiant and the other officers working on this investigation.

40.     On December 8, 2018, your Affiant and Ranger Tibbets interviewed a juvenile male concerning the take of the 2018 bull elk.   The juvenile was previously identified by Lavern Curry, Jonathan Doyle and Chastity Shot with Arrow as being present during the hunt when the elk was killed.   The juvenile confirmed he was present on the elk hunt and stated that he and Lavern Curry were the people that shot at and ultimately killed the elk.   The juvenile further knew that Lavern Curry, Jonathan Doyle and Chastity

15

Shot with Arrow were recently "busted" trying to the sell the antlers from the bull elk.

41.     On December 10, 2018, your Affiant was notified by a Bureau of Indian Affairs Criminal Investigator that Lavern Curry committed suicide near Sharps Corner on the Pine Ridge Indian Reservation.

42.     As part of Your Affiant's training and experience conducting wildlife investigations, your Affiant has developed knowledge regarding practices utilized by individuals that unlawfully take and/or traffic in wildlife. These routine practices include:

   a. The possession and use of portable electronic devices including cell phones and/or smart phones and phones with photo taking and/or internet access capabilities.  These devices are used in furtherance of wildlife violations by storing: contacts with customers, contacts with co-conspirators and contacts with suppliers/purchasers of the wildlife and parts thereof. Additionally, these devices are utilized to maintain contact information for co-conspirators and to store notes, or other information, related to the wildlife taking/trafficking such as field harvest photographs and GPS locations.

   b. Cell phones and smart phones can be used to aid in criminal activity.  Your Affiant's training and experience also indicates those who unlawfully take, buy, or sell wildlife and parts thereof often

16

have cell phones and/or smart phones in their possession that contain names and phone numbers of customers and suppliers. The names of customers and suppliers, phone call times and dates, text messages, email, and other digital files can all be stored in the internal or external memory of the phone. Cell phones and smart phones also allow individuals to use their device to capture video and pictures of themselves and/or others in the unlawful take and sale of wildlife and parts thereof.

43.     It is known to your Affiant that in order to completely and accurately retrieve data maintained in a portable electronic device's hardware or software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or intentional destruction, it is often necessary that the device be processed by a qualified specialist in a laboratory or other controlled setting.

44.     Analyzing electronic handheld devices for criminal evidence is a highly technical process requiring expert skill. Such devices utilize a vast array of different operating systems, software, and set-ups. The variety of hardware and software available requires even experts to specialize in some systems and applications. Thus it is difficult to know prior to the search which expert possesses sufficient specialized skill to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to

recover even "hidden," erased, compressed, password-protected, or encrypted files.    Since electronic evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Furthermore, there are often no software tools designed for forensic searches of particular handheld devices.  Thus, searching for and retrieving data from a portable electronic device can be even more complicated than searching a computer, even if the device has a much smaller memory capacity than a computer.

45.    Searching the portable electronic device for the evidence of unlawful wildlife take and/or trafficking may require a range of data analysis techniques.   In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, agents may be able to execute a "keyword" search that searches through the files stored in the device for special words that are likely to appear only in the materials covered by a warrant.  Similarly, agents may be able to locate relevant materials by looking for particular directory or file names.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law

enforcement searches for information.   These steps may require agents to conduct more extensive searches, such as scanning areas of the device's memory not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve evidence of unlawful wildlife take and/or trafficking located on said device.

46.    During the course of this investigation, your Affiant notes that Lavern Curry routinely and consistently used a portable electronic device to photograph and/or transmit photographs, text messages and Facebook messages related to the unlawful take, transportation, offer for sale and sale of both the 2016 and 2018 trophy bull elk.  The number associated with Lavern Curry's portable electronic device is known to be (605) 441-1492.  It is further known that Lavern Curry communicated with a confidential source using the above telephone number on numerous occasions, including sending and receiving text messages with photographs attached.

47.    Your Affiant recognizes this application is not typical in that as of December 10, 2018, Lavern Curry is deceased.  Your Affiant notes however, that evidence believed to be located on Lavern Curry's portable electronic device is considered valuable in determining other people's involvement with the unlawful wildlife trafficking, specifically the identity, or information that

will lead to the identification of the person(s) who purchased the 2016 6x7 bull elk.

48.     Based on the foregoing, there is probable cause to believe that the statutes and regulations described in paragraphs 9-14 above, have been violated by Lavern Curry, Jonathan Doyle, Chastity Shot with Arrow and others.  There is also probable cause to believe that the once real property of Lavern Curry, namely a portable electronic device with telephone number (605) 441-1492, contains unlawful wildlife taking and/or trafficking information constituting evidence of the commission of the above-described offenses, contraband, the fruits of the crime, property and information designed or intended for use and which is and has been used as the means of committing or documenting the offenses.

49.     In consideration of the foregoing, your Affiant respectfully requests that this Court issue a Search Warrant for the once real property of Lavern Curry, namely one (1) portable electronic device with telephone number (605) 441-1492.  Your Affiant respectfully requests to be permitted to access and search the contents of said device for all information and property constituting evidence of violations related to the unlawful take and/or trafficking of wildlife, or parts thereof.

FURTHER AFFIANT SAYETH NOT

Dated this 7th day of March, 2019.

_____
Brad C. Merrill, Special Agent
U.S. Fish and Wildlife Service

Sworn to before me and subscribed in my presence,

3-7-19                                    Rapid City SD
_____        _____
Date                                    City and State

_____
Daneta Wollmann
United States Magistrate Judge

21